UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN BRADFORD,

                  Plaintiff,

v.

ANDREW WURM and VINCENT PALAZZOLO,

                  Defendants.

    Case No. 08-11365
    Honorable David M. Lawson

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Brian Bradford alleges that he was injured during a pursuit and arrest by the defendants, who are police officers of the City of Ferndale, Michigan. Bradford had exited the vehicle he was driving and was on foot, when the defendants, each in a separate police vehicle, maneuvered their cars to impede Bradford's escape, resulting in Bradford being pinned between the bumpers of the two cars. Bradford suffered serious injuries to his leg and filed the present lawsuit alleging five counts in his amended complaint: state law claims for assault and battery, gross negligence, statutory non-economic liability for negligent operation of a motor vehicle under Michigan's No-Fault law, and statutory economic liability in excess of the statutory three-year limitation; and violation of federal constitutional rights to be free from an illegal seizure, invasion of privacy, and equal protection under 42 U.S.C. § 1983. The defendants have moved for partial summary judgment, not on the federal claims as one might expect, but arguing that the plaintiff fails to meet the "serious injury" threshold under the state's No-Fault law, and the common law claims must be dismissed because the police officers owe no duty to a fleeing motorist. The Court has reviewed the submissions of the parties and finds that the relevant law and facts have been set forth

in the motion papers and that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(e)(2). The Court finds that material fact questions preclude summary judgment on the grounds raised by the defendants. Therefore, the motion for partial summary judgment will be denied.

I.

Under Michigan's No-Fault law, which governs the right of a person to sue in tort for injuries arising from motor vehicle accidents, a party at fault for causing the accident cannot be held liable unless the injured person can prove that he or she has "suffered death, serious impairment of body function, or permanent serious disfigurement." Mich. Comp. Laws § 500.3135(1). In determining whether the plaintiff has met the statutory threshold defining the seriousness of an injury, the Michigan courts require an assessment of "the course or trajectory of the plaintiff's normal life." *Kreiner v. Fischer*, 471 Mich. 109, 131, 683 N.W.2d 611, 625 (2004).

Based on the parties' submissions, it does not appear that the trajectory of the plaintiff's life has propelled him toward the stratosphere. The plaintiff was forty-six years old on the date of the accident. At the time of his deposition, the plaintiff was homeless. He had completed the ninth grade before he was kicked out of school for drug use. The plaintiff has been diagnosed with bipolar disorder and paranoid schizophrenia, but is currently taking medicine to control these conditions.

The plaintiff has worked in various low-skill jobs during his life. A few years before the accident, he started Bradford's Pooper Scooper company. His friends "would hire [the plaintiff's] services to come in and do their pooper scooping for their dogs and their kennels and what they have and so forth." Def.s' Mot., Ex. B, Bradford Dep. at 23. He testified that he was in the process of

expanding his business beyond his friends in early 2005. The last day he worked was on October 1, 2005. He never reported any income to the government for tax purposes.

The plaintiff has used crack cocaine throughout his life. Within a week and a half to two weeks prior to his deposition, he had used crack cocaine. He said that was the first time in forty days he had used it, although before that he used it "real often. Every other day, every couple of days or so." Def.s' Mot., Ex. B, Bradford Dep. at 18.

The events on the day of the accident (or the day before, or two days before – the plaintiff cannot remember exactly) began when the plaintiff met a woman at a liquor store who was driving her vehicle into another person's vehicle in the parking lot. According to the plaintiff's deposition testimony, it appears that the plaintiff struck up a conversation with her and befriended her. They drove in her truck, parked, and started smoking crack cocaine and engaging in sexual activity. The plaintiff perceived that the woman was drunk and was unable to drive. So, according to the plaintiff, the woman gave him the keys to the vehicle and gave him permission to drive it. They then proceeded to the home of a drug dealer named Dwight.

Dwight sold them some crack cocaine, and the plaintiff went to get money for the drugs from his son who lived nearby. When he returned, the woman he had met had become interested in another man. The plaintiff explained that several men "tried to start jumping" the plaintiff, so he ran to the woman's truck, and drove off. *Id.* at 45. The plaintiff came to a stop some distance away and fell asleep in the truck.

When he woke up, the date was October 4, 2005. The plaintiff says he went looking for the woman, returning to Dwight's house. When he could not find her, he left and found some of his

other friends, Kristen and "big booty Judy," who had a motel room. He showered and changed his clothes, and also got "buzzed," presumably on cocaine. *Id.* at 55.

The plaintiff and Kristen then decided to drive to the home of the plaintiff's son. As they exited the motel parking lot, the plaintiff testified that he was pursued by a Ferndale police vehicle driven by defendant Vincent Palazzolo. Palazzolo, a sergeant with the Ferndale Police Department, had checked the truck's license tag as it was parked in the hotel. The law enforcement information network's (LEIN) records reported it as stolen in a carjacking by two black males.

The plaintiff admits that "I guess you could say I was trying to get away" from officer Palazzool. *Id.* at 56. While underway, Kristen opened the door twice, demanding that the plaintiff pull over or she was going to jump, but the plaintiff refused to do so. The plaintiff's deposition testimony is unclear on what happened next, but he states that when he tried to get away, "[t]he car wasn't running. See, on the impact of the car, the car's fuel system cut off." *Ibid.* It likewise is not clear to what impact the plaintiff refers, as it does not appear to be in his deposition testimony. However, Palazzolo's deposition testimony sheds some light on this. It appears that upon being approached by the police car, the plaintiff's vehicle made a right turn, and hit a curb with such force that it appeared to damage the vehicle. The vehicle then proceeded into a subdivision, where according to Palazzolo it was going about fifteen or twenty miles per hour. The plaintiff perceived that the car was "coasting at about six miles an hour." *Id.* at 56. Defendant Ferndale Wurm, a Ferndale police officer who was summoned to assist, approached in his vehicle around this time.

The stories diverge a bit at this point. The plaintiff testified that he directed the car onto the grass, put it into park, and then exited the vehicle. He does not remember what happened next, but he "woke up" with a police car "over top" of him. *Id.* at 58. There were two police vehicles at the

scene, with one officer in each.  The officer then backed up the car that was on top of the plaintiff, and the plaintiff got up and began running away again.  When the plaintiff ran, one officer, presumably Palazzolo, moved one car toward the plaintiff, who was running by the other police car, and the plaintiff dove to the ground.  When he dove, his left leg was in the air, and it became pinned between the police car that had moved towards the plaintiff and the one that was parked.

Palazzolo described the incident differently.  He testified that the plaintiff maneuvered the vehicle off the road, and when it slowed to five or ten miles per hour, the plaintiff exited the vehicle. The plaintiff tripped and fell because he could not run as fast as the car was going.  Palazzolo testified:

> I was angling away from his vehicle, so it would have been straightening out more towards Officer Wurm. . . . We slid into each other, Officer Wurm and I, and Mr. Bradford got pinched in between the bumpers.

Pl.'s Resp., Ex. B, Palazzolo Dep. at 20.  Palazzolo testified that he "remember[s] sliding," which is why he was unable to stop the car before pinching the plaintiff.  *Id.* at 21.  However, he also testified that he intended to place his vehicle between the plaintiff and the south in order to trap him and prevent him from running away.

The plaintiff was brought to the Beaumont Hospital in Royal Oak, Michigan in an ambulance, and spent six days in the hospital.  He was diagnosed with a left open (compound) femur fracture and was brought into surgery the same day to clean out the wound.  Three days later he was brought into surgery again to repair the broken bone.  An intramedullary rod was inserted, which apparently has never been removed.  The plaintiff claims he spent four or five months in physical therapy.  He also claims that two additional surgeries are required.

Upon his discharge from the hospital, the plainitff was arrested and brought to court on a charge of fleeing and eluding police, to which he pleaded no contest. Apparently no carjacking charges were ever filed.

The Beaumont Hospital records submitted by the plaintiff show frequent complaints of pain in the months and years following the surgery, mostly attributable to the hardware still being in place. The plaintiff went to the hospital for a recheck of his leg in April and July 2006. In each visit the plaintiff complained of pain, but the examination showed the surgical incision to be well healed. The plaintiff was given medication for his pain.

On March 22, 2007, the plaintiff went to the Beaumont Hospital for a recheck of his leg. The examination "show[ed] the previous surgical incision to be well healed." Pl.'s Resp., Ex. D. Consistent with the earlier visits, the report states:

> There is some minimal crepitus in the knee, no significant effusions. Knee remains stable, no signs of infections, no RSD or DVT signs.
>
> X-rays of the right femur, multiple views, show status post iron rod fixation, healed fracture, hardware maintained in position.

*Ibid.* The report notes that the plaintiff complained of pain, and the plaintiff was offered surgery to remove the hardware. The plaintiff indicated his desire to undergo this surgery, but apparently has not yet scheduled the surgery. On May 10, 2007, the plaintiff returned for another recheck. The report states: "No new problems. Exam is unchanged. X-rays is unchanged." *Ibid.*

Emmanuel Obianwu, M.D., evaluated the plaintiff on November 25, 2008 at the defendants' request. He notes that the plaintiff told him that he went to regular check-up appointments with the surgeon, but has not gone in the past year due to lack of funds. He has gone to various emergency departments complaining of severe pain in his left thigh and is usually given pain medication. At

his evaluation with Dr. Obianwu, the plaintiff complained of "constant pain." Dr. Obianwu concluded that "the injury has healed and he can return to whatever type of work he needs." Pl.'s Resp., Ex. E.

The plaintiff complains that there are "[l]ots of things" that he can no longer do since his injury. Def.'s Mot., Ex. 2, Bradford Dep. at 73. He states that he has to limp when he walks, he is "in constant pain," and he cannot sit for longer than forty minutes without having to get up and stretch. *Ibid.* He can no longer go for five mile runs, like he used to every morning during the periods when he was not using crack cocaine. He cannot play and run around with any of his 53 grandchildren, teaching the younger grandchildren how to ride the bicycle like he did for many of their older cousins. And he "can't squat down to do [the] pooper scooping," that is required by that job, so he does not operate his business anymore. *Id.* at 77.

Since the accident, the plaintiff has "[s]ort of" been looking for a job, which he describes as calling around and looking in the newspaper. *Id.* at 13. He called less than ten places in the three months preceding his deposition and has not sought governmental assistance to find a job.

As noted, the defendants filed a motion challenging only some of the state law counts of the amended complaint. The defendants do not identify specifically the counts they want dismissed, but their arguments are directed only to the No-Fault claims in particular (counts III and IV) and the state law negligence-based claims in general (counts II, III, IV).

II.

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover*

*Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson*, 477 U.S. at 252) (internal quote marks omitted).

A.

The defendants first mount a broad attack upon the plaintiff's two claims under Michigan's No-Fault Insurance Act and his claim for gross negligence. The defendants argue that they owed

no duty to the plaintiff because the injuries resulted when the plaintiff was attempting to flee from a lawful arrest. Because all three of those claims are based on some level of negligence (although the No-Fault claims require additional proofs to establish liability), the absence of a legal duty would be fatal to each of those claims. The defendants do not discuss the other theories – battery and federal constitutional violations – in their motion, and they do not ask for summary judgment against those theories of liability.

The elements of a common law claim of negligence in Michigan are:

(1) that the defendant owed the plaintiff a duty; (2) that the defendant breached that duty; (3) that the defendant's breach caused the plaintiff's harm, which includes (a) cause in fact and (b) legal, or proximate, cause; and (4) damages to the plaintiff.

*Hunley v. DuPont Automotive*, 341 F.3d 491, 496 (6th Cir. 2003) (citing *Case v. Consumers Power Co.*, 463 Mich. 1, 7 & n.6, 615 N.W.2d 17, 20 & n.6 (2000)); *see also Riddle v. McLouth Steel Products Corp.*, 440 Mich. 85, 96 n. 10, 485 N.W.2d 676, 681 n. 10 (1992). "Questions of duty are generally for the court to decide." *Jackson v. Oliver*, 204 Mich. App. 122, 125, 514 N.W.2d 195, 196 (1994).

The burden of a plaintiff to establish a legal duty of governmental employees, such as the defendant police officers here, has been increased by the Michigan legislature, which has provided "governmental employees with immunity from tort liability for injuries they cause during the course of their employment so long as the employee's conduct 'does not amount to gross negligence that is the proximate cause of the injury or damage.'" *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 408 (6th Cir. 2007) (quoting Mich. Comp. Laws § 691.1407(2)(c)). "'Gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(7)(a). This rule has been analogized to the doctrine of qualified

immunity existing in section 1983 claims. *See Lanman v. Hinson*, 529 F.3d 673, 690 (6th Cir. 2008).

In *Fiser v. Ann Arbor*, 417 Mich. 461, 339 N.W.2d 413 (1983), *overruled on other grounds by Robinson v. City of Detroit*, 462 Mich. 439, 613 N.W.2d 307 (2000), the Michigan Supreme Court held that officers owed a duty to the public not to operate their vehicles in a manner that unreasonably endangers the lives of others. In that case, the police had initiated a car chase after the plaintiff failed to stop at a flashing red light. The vehicles traveled at speeds up to thirty miles over the posted speed limit. The chase ended when the motorist attempting to elude police did not stop at a stop sign and collided with the plaintiff's vehicle. The Court found that the officers could be held liable for operating their vehicles in a reckless manner, and their pursuit could be a proximate cause of the plaintiff's injuries.

In *Jackson v. Oliver*, 204 Mich. App. 122, 514 N.W.2d 195 (1994), the Michigan Court of Appeals considered a case where the plaintiff's decedent was killed while he fled from the defendant police officers who pursued him. The plaintiff was riding a motorcycle and led the police on a chase after they saw him exceeding the speed limit. The plaintiff crashed when he lost control of his motorcycle because he was traveling too fast. The Court held as follows:

> The *Fiser* rule is that police officers owe a duty to innocent bystanders to avoid operating their police vehicles in a negligent manner and that emergency vehicles must be driven with due regard for the safety of others. We do not believe that the *Fiser* decision applies in a case where injuries were suffered by a fleeing wrongdoer.
>
> The trial court's decision to grant summary disposition was based on public policy grounds: that a fleeing wrongdoer should not be able to recover money damages from the officers who were pursuing him. We agree. Out of concern for public safety, police must sometimes allow fleeing suspects to get away. However, it would be absurd to conclude that the police, out of concern for the safety of a fleeing criminal suspect, must cease pursuit of the fleeing suspect or risk possible

> civil liability. . . . A criminal suspect who defies police authority does not thereby trigger some enhanced duty or obligation on the part of the police. The only limitation on the part of the police is the obligation not to use excessive force when apprehending or attempting to apprehend the suspect. Here, the police did not shoot at the decedent or at his vehicle, they did not set a trap designed to make him lose control of his vehicle, and they did not intentionally ram his vehicle. They did not establish the speed of the chase and did not control the route, they simply attempted to prevent the decedent's escape. This is not the use of excessive force, it is the use of minimal force.
>
> . . . Police officers in pursuit of a suspect do not owe the suspect a duty to refrain from chasing the suspect at speeds dangerous to the suspect.

*Jackson*, 204 Mich. App. at 126-27, 514 N.W.2d at 197.

The reasoning of *Jackson* has been ratified by the Michigan Supreme Court. In 2000, the Michigan Supreme Court stated that "[c]onsistent with the reasoning in *Fiser* and *Jackson*, whatever [the victim's] location [in the vehicle], there is a duty to innocent persons, but not to wrongdoers" owed by police during the pursuit of a fleeing vehicle. *Robinson v. City of Detroit*, 462 Mich. 439, 451, 613 N.W.2d 307, 314 (2000). However, the court curtailed the expansive understanding of proximate cause articulated in *Fiser*, holding that

> [The] pursuit of the fleeing vehicles was not, as a matter of law, "the proximate cause" of the injuries sustained by the plaintiffs. The one most immediate, efficient, and direct cause of the plaintiffs' injuries was the reckless conduct of the drivers of the fleeing vehicles.

*Id.* at 462, 613 N.W.2d at 319. The plaintiffs in that case were passengers in vehicles that were the object of the chase, and they were injured when their drivers lost control during the high-speed pursuit and collided with other vehicles. The court limited its holding that the chase initiated by the police was not the cause of the accident to circumstances "where the police cars did not hit the fleeing car or physically cause another vehicle or object to hit the vehicle that was being chased or

physically force the vehicle off the road or into another vehicle or object." *Id.* at 445, 613 N.W.2d at 311.

The question presented is whether under these cases, the defendant police officers had a duty not to operate their cars in a grossly negligent manner after the car chase had ended and the plaintiff was proceeding on foot.

Despite broad language, the *Jackson* and *Robinson* opinions are readily distinguishable on the facts. In *Jackson*, the plaintiff caused his own injuries by undertaking excessive speeds in response to the police officers' pursuit. The court made much of this fact, noting that "What endangered, and ultimately took, the life of the decedent was his own speeding and reckless conduct. He lost control of his motorcycle because he was going too fast, not because the police were." *See Jackson*, 204 Mich. App. at 126-27, 514 N.W.2d at 197. *Robinson* contains similar reasoning. In fact, the court in that case engrafted a new requirement upon the passangers in the fleeing cars, now requiring that a "passenger who seeks to recover for injuries allegedly caused by a negligent police pursuit [must prove] personal innocence as a precondition to establishing the duty element of a cause of action." *Robinson*, 462 Mich. at 444, 613 N.W.2d at 311.

The case presented by Mr. Bradford is different because Bradford did not cause his injuries; the defendants' alleged gross negligence in the operation of a motor vehicle was the cause. Bradford was on foot when he was impacted by the police vehicle. His physical contact with the defendants' vehicles takes his case within the exception to the rule articulated in *Robinson*.

The defendants ask the Court to overlook the particular facts of *Jackson* and announce a categorical rule that the police may do whatever they like to a wrongdoer who is fleeing. The Court declines to do so; there is no support in the Michigan cases for that proposition. *Cf. Scott v. Harris*,

550 U.S. 372 (2007) (noting that a violation of the Constitution may occur when police officers cause a fleeing vehicle to crash). Implicitly, *Jackson* foresaw a duty under different circumstances against officers who engaged in other conduct against fleeing individuals resulting in injuries other than those self-inflicted. The facts of Bradford's case resemble more closely the hypothetical situations that the opinion excepts from its general rule. The risk of injury from the defendants' navigation of a vehicle towards a pedestrian was great; and the defendants had a duty to avoid grossly negligent conduct that caused an impact with the plaintiff.

B.

The defendants focus an attack on the No-Fault counts of the amended complaint, alleging that the plaintiff has failed as a matter of law to establish the other elements of those claims beyond the defendants' gross negligence. Although the No-Fault Act abolished most tort liability "arising from the ownership, maintenance, or use within this state of a motor vehicle," Mich. Comp. Laws § 500.3135(3); *see Stephens v. Dixon*, 449 Mich. 531, 541, 536 N.W.2d 755, 759 (1995), the Act preserves tort liability under narrow circumstances, two of which are relied upon by the plaintiff in this case. The first claim is under section 3135(1), which allows for tort liability "for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered . . . serious impairment of body function. . . ." Mich. Comp. Laws § 500.3135(1). The second claim is under section 3135(3), which states that "tort liability arising from the ownership, maintenance, or use within this state of a motor vehicle with respect to which the security required by section 3101 was in effect is abolished except as to: . . . [d]amages for . . . work loss . . . as defined in sections 3107 to 3110 in excess of the daily, monthly, and 3-year limitations contained in those sections." Mich. Comp. Laws § 500.3135(3).

1.

The statute defines "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." Mich. Comp. Laws § 500.3135(7). In determining whether a plaintiff qualifies under this section, the Michigan Supreme Court suggests a three-step inquiry.

> First, a court must determine that there is no factual dispute concerning the nature and extent of the person's injuries; or if there is a factual dispute, that it is not material to the determination whether the person has suffered a serious impairment of body function. . . .
>
> Second, if a court can decide the issue as a matter of law, it must next determine if an "important body function" of the plaintiff has been impaired. It is insufficient if the impairment is of an unimportant body function. Correspondingly, it is also insufficient if an important body function has been injured but not impaired. If a court finds that an important body function has in fact been impaired, it must then determine if the impairment is objectively manifested. Subjective complaints that are not medically documented are insufficient.

*Kreiner*, 471 Mich. at 131-33, 683 N.W.2d at 625. In determining the nature of the impairment, "[t]he focus. . . is not on the plaintiff's subjective pain and suffering, but on injuries that actually affect the functioning of the body. For instance, '[s]elf-imposed restrictions,' even if based on real pain, are not sufficient to establish residual impairment; rather, the restrictions must be 'physician-imposed.'" *Netter v. Bowman*, 272 Mich. App. 289, 295-96, 725 N.W.2d 353, 357 (2006) (quoting *Kreiner*, 471 Mich. at 133 n. 17, 683 N.W.2d at 625 n. 17). Based on *Kreiner* and cases that follow it, the Michigan Court of Appeals held that "'objectively manifested' . . . requires that a plaintiff's injury must be capable of objective verification by a qualified medical person either because the injury is visually apparent or because it is capable of detection through the use of medical testing." *Id.* at 305, 725 N.W.2d at 362.

Finally,

> [i]f a court finds that an important body function has been impaired, and that the impairment is objectively manifested, it then must determine if the impairment affects the plaintiff's general ability to lead his or her normal life. In determining whether the course of the plaintiff's normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiff's life before and after the accident as well as the significance of any affected aspects on the course of the plaintiff's overall life. Once this is identified, the court must engage in an objective analysis regarding whether any difference between the plaintiff's pre- and post-accident lifestyle has actually affected the plaintiff's "general ability" to conduct the course of his life. Merely "any effect" on the plaintiff's life is insufficient because a *de minimis* effect would not, as objectively viewed, affect the plaintiff's "general ability" to lead his life.

*Kreiner*, 471 Mich. at 133, 683 N.W.2d at 625-26. In deciding the third prong, the supreme court suggested a nonexhaustive list of factors to consider:

> (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery.

*Id.* at 133, 683 N.W.2d at 626. "A negative effect on a particular aspect of an injured person's life is not sufficient in itself to meet the tort threshold, as long as the injured person is still generally able to lead his normal life." *Id.* at 137, 683 N.W.2d at 628.

There is no dispute that in 2005 the plaintiff suffered an injury to his leg, and the injury was objectively confirmed. The defendants do not argue that the injury affected an important body function that prevented him from walking, at least for a time. *See Kreiner*, 471 Mich. at 136, 683 N.W.2d at 628 (holding that an injury to lower back, hip, and leg constituted an impairment of an important body function).

The defendants argue, however, that this impairment did not affect the plaintiff's general ability to lead his life. The Court finds, however, that fact issues exist in the record that preclude judgment on this point as a matter of law. The plaintiff testified that the injury has changed his life in two ways: it has interfered with his ability to play with his grandchildren and has prevented him

from running his biological waste removal business. Before the injury he could work as a "poop scooper," and afterwards he cannot; before the injury he could teach his grandchildren how to ride their bikes and go for runs, and now he cannot. Unlike one of the plaintiffs in *Kreiner*, who was prevented from working for a few months, the plaintiff's inability to work his previous job removing pet waste has continued to this date. Unlike the other plaintiff in *Kreiner*, who lost the ability to perform one aspect of his job but who did not miss a single day of work due to his injuries, the plaintiff has lost the ability to engage in his business. Mr. Bradford is now unemployed and living in a homeless shelter, hardly evidence that his life "in general" has remained unchanged. Summary judgment on this ground, therefore, must be denied.

The defendant also suggests the possibility that the plaintiff's claim is barred by his comparative negligence under Michigan Compiled Laws § 500.3135(2)(b). This statute bars a claim for noneconomic damages by "a party who is more than 50% at fault." Mich. Comp. Laws § 500.3135(2)(b). However, because the defendants do not develop this argument, the Court finds that it is waived. Moreover, the question of a plaintiff's comparative negligence is a question for the jury, as is the question of the proximate cause of that negligence. *Rodriguez v. Solar of Michigan, Inc.*, 191 Mich. App. 483, 488, 478 N.W.2d 914, 918 (1991). Here, a reasonable jury could conclude that the plaintiff was not negligent by running away across a yard. The determination of comparative fault in this case is not appropriate for resolution on summary judgment.

2.

The defendants also argue that the plaintiff has not offered evidence to prove "[d]amages for . . . work loss . . . in excess of the daily, monthly, and 3-year limitations" otherwise applicable to such claims under the No Fault Act. Mich. Comp. Laws § 500.3135(3)(c). Work loss is defined by section 3107 of the Act as "loss of income from work an injured person would have performed during the first 3 years after the date of the accident if he or she had not been injured." Mich. Comp. Laws § 500.3107(1)(b).

The defendants' challenge to the plaintiff's claim for damages under this provision is that the plaintiff has not provided any solid evidence of his pre-accident work income. The defendants' challenge fails for two reasons. First, nothing in the Act requires that the person be employed before his injury in order to be entitled to work loss. *See Sullivan v. North River Ins. Co.*, 238 Mich. App. 433, 437, 606 N.W.2d 383, 385 (1999) (noting that the Michigan Supreme Court "clearly recognized that a claimant's entitlement to work-loss benefits is not dependent on being employed at the time of the accident"). To the contrary, the Act contemplates that an award of work loss can occur even if a person is "temporarily unemployed at the time of the accident." Mich. Comp. Laws § 500.3107a. Temporary unemployment "refers to the unavailability of employment, not the physical inability to perform work." *Popma v. Auto Club Ins. Ass'n*, 446 Mich. 460, 468, 521 N.W.2d 831, 835 (1994). There is no evidence that the plaintiff's lack of work (if any) was the result of his physical inability to work before his accident. In cases where the plaintiff was temporarily unemployed, the Act provides that the work loss should be calculated based on the "earned income for the last month employed full time preceding the accident." Mich. Comp. Laws § 500.3107a. Summary judgment may not be granted solely on the basis that the plaintiff was not working immediately preceding the accident.

The second reason the defendants' argument fails is that it ignores the plaintiff's testimony that he ran a business before the accident. The defendants point to the absence of certain corroborating records, such as tax forms or business receipts. That certainly is a valid point for a jury. However, the plaintiff does not have to produce documentary evidence supporting his claims in order to defeat summary judgment as a matter of law. The plaintiff relies on his sworn deposition testimony, which is all that is required by Rule 56.

### III.

Based on the parties' submissions, there is reason to doubt the likelihood of success of the plaintiff's claims that the officers committed gross negligence or violated his civil rights. But the grounds raised by the defendants in their motion do not justify summary judgment.

Accordingly, it is **ORDERED** that the defendants' motion for partial summary judgment [dkt #15] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: April 6, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 6, 2009.

s/Lisa Ware
LISA WARE